

1  AZRA Z. MEHDI (220406)
2  THE MEHDI FIRM
   9107 Wilshire Blvd., Suite 450
3  Beverly Hills, CA 90210
4  Telephone: (310) 853-8010
   Facsimile: (310) 853-8011
5  azram@themehdifirm.com

6  HALUNEN & ASSOCIATES
7  CLAYTON D. HALUNEN
   SUSAN M. COLER
8  MELISSA W. WOLCHANSKY
9  1650 IDS Center
   80 South Eighth Street
10 Minneapolis, MN 55402
11 Telephone: (612) 605-4098
   Facsimile: (612) 605-4099
12 halunen@halunenlaw.com
13 coler@halunenlaw.com
   wolchansky@halunenlaw.com
14

15 Attorneys for Plaintiff and the [Proposed] Class

16              UNITED STATES DISTRICT COURT

17             CENTRAL DISTRICT OF CALIFORNIA

18
   CONNOR RUCKS, Individually and on  )   Case No.:   **EDCV12 - 02231 VAP (SPx)**
19 Behalf of All Others Similarly Situated,  )
                                          )   Class Action
20                                         )
21                  Plaintiff,             )   COMPLAINT
                                          )
22           vs.                           )   DEMAND FOR JURY TRIAL
                                          )
23 MONSTER BEVERAGE                        )
24 CORPORATION, MONSTER ENERGY )
   COMPANY, and DOES 1-20, inclusive, )
25                                         )
26                  Defendants.            )
   _____
27
28

Plaintiff, Connor Rucks, by and through the undersigned counsel, brings this consumer class action both individually and on behalf of all others similarly situated, against defendants Monster Beverage Corporation ("MBC") and Monster Energy Company ("MEC") (collectively, "Defendants" or the "Company"). Plaintiff's allegations are based on information and belief formed after an inquiry reasonable under the circumstances and are likely to have evidentiary support after reasonable opportunity for further investigation and discovery, except where specifically so identified as being based on personal knowledge:

## NATURE OF THE ACTION

1.      This is a consumer class action seeking redress for Defendants' unfair and deceptive business and trade practices on behalf of anyone who purchased for personal consumption any of the Monster-branded energy drinks, including any of the following ("Monster Energy Drinks"):

| | |
|---|---|
| Monster Energy® | Java Monster® Kona Blend |
| Lo-Carb Monster Energy® | Java Monster® Loca Moca® |
| Monster Energy® Assault® | Java Monster® Mean Bean® |
| Monster Khaos® | Java Monster® Vanilla Light |
| Monster M-80® | Java Monster® Irish Blend® |
| Monster MIXXD® | Java Monster® Toffee |
| Monster Energy® Absolutely Zero | Monster Energy Extra Strength |
| Monster Energy® Import | Nitrous Technology® Super Dry™ |
| Monster Energy® Import Light | Monster Energy Extra Strength |
| Monster Energy® Dub Edition | Nitrous Technology® Anti-Gravity® |
| Monster Rehab™ Tea + Lemonade + Energy | Monster Energy Extra Strength Nitrous Technology® Killer B® |
| Monster Rehab™ Rojo Tea + Energy | |
| Monster Rehab™ Green Tea + Energy | Monster Energy Extra Strength Nitrous Technology® Black Ice™ |
| Monster Rehab™ Protean + Energy | |
| Monster Energy® M3™ Super Concentrate | X-Presso Monster® Hammer |
| | X-Presso Monster® Midnite |

CLASS ACTION COMPLAINT

2.    The Company develops, markets, sells, and distributes beverages and soft drinks in the United States and internationally.   Defendants falsely or misleadingly label, market and advertise for sale a highly caffeinated concoction – the Monster Energy Drinks – as if it were a conventional beverage or food.

3.    The Company does not disclose the caffeine content in its drinks and has chosen to categorize the Monster Energy Drinks as a "dietary supplement," rather than as a beverage or as a conventional food item.  The Company's own public filings, however, do not describe the Monster Energy Drinks as a dietary supplement, but rather indicate that it is a "carbonated energy *drink*."  As detailed further below, such labeling, marketing and advertising is an attempt to circumvent the safety standards applicable to food and beverage additives and creates a false perception by the consumer that these products are safe.

4.    Monster Energy Drinks, in fact, contain a dangerously high amount of caffeine that have never been subjected to any kind of pre-market review by any regulatory authority prior to them being put in the stream of commerce.  Numerous scientific studies have shown that the consumption of large amounts of caffeine, in combination with other active ingredients like guarana, taurine, carnitine, sugar, among others, by youth and adolescents can have serious health consequences. Yet, Defendants knowingly or with reckless indifference, market, advertise and sell Monster Energy Drinks as completely safe via playful/seductive advertising designed to attract pre-teens and teens and via product placement.

5.    Notwithstanding the high caffeine levels in Monster Energy Drinks and the scientific evidence of serious health risks these levels may pose for adolescents and youth, Defendants' advertising, marketing and promotions expressly target the 13 to 21-age group.  Defendants intend to and do, in fact, capture teenagers and other youth by designing and disseminating their marketing campaigns to specifically target and attract such youth.   Yet, Defendants'

2

CLASS ACTION COMPLAINT

advertising and labeling fails miserably at providing any warning regarding the dangers of frequent or excessive consumption of caffeine to this very same group that they target.  As a result of the false and misleading labeling, marketing and advertising, and failure to warn of risks, the Company has profited immensely from its Monster Energy Drinks' sales, capturing almost 35% of the market share and generating sales of almost $2 billion annually in 2011.

### JURISDICTION AND VENUE

6.     This Court has jurisdiction over all the causes of action asserted herein.   The Court has jurisdiction over the Magnuson-Moss Warranty Act ("MMWA") claim pursuant to 28 U.S.C. §1331 because a federal question is involved and pursuant to 15 U.S.C. §2310(d) because (a) the amount in controversy of any individual claim is less than the sum or value of $25.00; (b) the amount in controversy is greater than the sum or value of $50,000 computed on the basis of all claims in the suit; and (c) the number of plaintiffs is more than 100. The Court has supplemental jurisdiction over state law claims under 28 U.S.C. §1367(a) as claims herein arise under the same set of facts comprising a single case or controversy.

7.     This Court has jurisdiction over the subject matter presented by this complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332, *et seq.*, which explicitly provides for the original jurisdiction of the federal courts over any class action in which any member of the plaintiff class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5 million, exclusive of interest and costs.

8.     More than two-thirds of the members of the class are citizens of a state other than California and, as set forth below, the Company is a citizen of

3

CLASS ACTION COMPLAINT

California.   Therefore, diversity of citizenship exists under CAFA, as required by 28 U.S.C. §1332(d)(2)(A).

9.     The total claims of the individual members of the class in this action are in excess of $5 million in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. §1332(d)(2), (6).

10.    As stated above, more than two-thirds of all of the members of the proposed class in the aggregate are citizens of a state other than California, where this action was originally filed, and the total number of members of the proposed class is greater than 100, pursuant to 28 U.S.C. §1332(d)(5)(B).

11.    The Court has personal jurisdiction over Defendants because they have purposefully availed themselves of the privilege of conducting business within the State of California by marketing, advertising and selling the Monster Energy Drinks to plaintiff and members of the proposed class, as well as generally maintaining systematic and continuous business contacts within the State of California.

12.    Venue is proper pursuant to 28 U.S.C. §1391(a) because the Company conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, marketing and administration of its products in this District. Filed concurrently with this Complaint is the Declaration of Azra Z. Mehdi Pursuant to California Civil Code Section 1780(c) of the Consumer Legal Remedies Act, Cal. Civ. Code Section 1750, *et seq*., which is incorporated by reference herein.

13.    California has numerous contacts with the conduct alleged herein and a strong interest in applying its laws to that conduct.   The Company is found, does business or transacts business within California.   The Company maintains its principal offices, as well as agents, in California and is licensed to do, has done,

4

and continues to do business in California.  Defendants' advertising, marketing, pricing, sales and distribution operations for their Monster-branded energy drinks sold throughout the United States, which form the basis of this litigation, originated from and/or are controlled by, Defendants' offices in California.  In addition, the Company directly advertised, marketed and sold its energy drinks to consumers in California as well as the other states in the country.  As such, California's interest in applying California law in this litigation outweighs any interests other states or their laws may have.

## PARTIES

14.   Plaintiff Connor Rucks is a citizen of Florida who currently resides in Miami, Florida.  Plaintiff has been purchasing and consuming a variety of the Monster Energy Drinks for the past nine (9) years, since he was about 17 years old. Mr. Rucks has consumed the original Monster Energy Drink with the green tab and the Lo-Carb version most frequently.  At various times, he also has consumed other varieties.  Going back nine years, Mr. Rucks consumes an average of five to six cans per week, with that number going up significantly during the weeks prior to and during exams, as well as on the weekends.  Mr. Rucks first tried Monster Energy Drinks when he was a junior in high school.  He chose Monster Energy Drinks over other energy drinks because the marketing was attractive to him as a teenage male.  Mr. Rucks believed that Monster Energy Drinks were safe for consumption by persons of all ages.  Further, Mr. Rucks saw nothing on the labeling of the Monster Energy Drink can that would lead him to believe that drinking the Monster Energy Drink could be bad for his health.  Had Mr. Rucks known these facts, he would not have purchased and consumed Monster Energy Drinks.

15.   Defendant Monster Beverage Corporation, f/k/a Hansen Natural Corporation, is a Delaware corporation with its principal place of business at 550

5

Monica Circle, Suite 201, Corona, California 92880.  MBC is a publicly traded company whose stock trades on the NASDAQ under the ticker symbol MNST. MBC's business is listed under the Consumer Goods category and identifies its operations as falling in the beverage and soft drink industry.  MBC is a holding company that carries no operating business, except through its wholly owned subsidiaries.   MBC through its subsidiaries, develops, markets, sells, and distributes alternative beverage category beverages in the United States and internationally.

16.    Defendant Monster Energy Company, f/k/a Hansen Beverage Company, is a Delaware corporation with its principal place of business at 550 Monica Circle, Suite 201, Corona, California 92880.  MEC is a wholly owned subsidiary of MBC.  MEC produces and distributes a variety of sodas, fruit juices, teas, energy drinks and waters.   MEC conducts substantially all of MBC's operating business and generates substantially all of the Company's operating revenues.

17.    The Company was engaged in and continues to be engaged in and responsible for the design, manufacture, production, testing, study, inspection, mixture, labeling, marketing, advertising, sales, promotion, and/or distribution of variety of Monster Energy Drinks under the brand "Monster," as described in ¶1, *supra*.

18.    Plaintiff is currently unaware of the true names, capacities, or basis for liability of defendants Does 1 through 20, inclusive, and therefore sues said defendants by their fictitious names.  Does 1-20 are individuals, associations or corporations who/that are affiliated or related to the Company, who will be specifically identified and named as discovery progresses and their roles in the wrongdoing at issue is revealed.  At all times mentioned in the Counts alleged herein, each and every defendant was an agent, representative, affiliate, or

CLASS ACTION COMPLAINT

employee of each and every other defendant, and in doing the things alleged in the Counts stated herein, each and every defendant was acting within the course and scope of such agency, representation, affiliation, or employment and was acting with the consent, permission and authorization of the other defendants.  During the relevant time period, defendants agreed to misrepresent to the class members the material facts at issue herein and/or not to notify class members about the scope and nature of the illegal business practices as detailed herein, thus engaging in a conspiracy that resulted in injury in fact to members of the class, which conspiracy is still on-going.  All actions of each defendant, as alleged in the Counts stated herein, were ratified and approved by the other defendants or their respective directors, officers and/or managing agents, as appropriate for the particular time period alleged herein.  Plaintiff is informed and believes, and on that basis alleges, that defendants Does 1 through 20, inclusive, and each of them, are in some manner liable to Plaintiff, and/or are proper and necessary parties to this action in light of the relief requested.  Plaintiff will amend the Complaint (if necessary) to allege their true names, capacities or basis for liability when the same have been ascertained.

## FACTUAL ALLEGATIONS

**A.    Company Background**

19.    The Company's beverage business is divided into Direct Store Delivery ("DSD"), whose principal products comprise Monster Energy Drinks, and Warehouse, whose principal products comprise juice based and soda beverages under many different brand names.  Defendants have generated just under $2 billion, $1.5 billion and $1.3 billion in gross sales in 2011, 2010 and 2009, respectively.  The Company's gross sales for the first three quarters of 2012 have already surpassed $1.8 billion.  Over 90% of Defendants' sales figures and gross profits are attributable to the Company's Monster Energy Drinks division.

7

CLASS ACTION COMPLAINT

1  Monster Energy Drinks have recently become the number one top selling energy
2  drink world-wide, knocking off rival Red Bull.

3          20.     Although energy drinks generally make up only a tiny portion of the
4  entire beverage market, it is the fastest-growing segment.  The growth of energy
5  drinks is directly attributable to its popularity among pre-teens and teens.  Energy
6  drink sales rose by more than 16% in 2011 and Defendants were in the lead with
7  35% of the market.

8          21.     In fact, to capitalize on the success of its Monster Energy Drinks, the
9  Company which used to be known as the Hansen Natural Corporation and Hansen
10 Beverage Company, officially changed its name to Monster Beverage Corporation
11 and Monster Energy Company, respectively, on January 5, 2012.

12 **B.     Ingredients in Monster Energy Drinks**

13         22.     Energy drinks have surged in popularity in recent years, especially
14 among high school and college students.  The most common ingredient in energy
15 drinks, including in Monster Energy Drinks, is caffeine, which is often combined
16 with taurine, glucuronolactone, L-carnitine, guarana, and B vitamins to form what
17 is referred to by the Company as an "energy blend."

18         23.     Energy drinks often contain additional amounts of caffeine through
19 additives, including guarana, kola nut, yerba mate, and cocoa.  Guarana (Paullinia
20 cupana) is a plant that contains caffeine, theobromine (a chronotrope), and
21 theophylline (an inotrope).  Each gram of guarana can contain 40 to 80 mg of
22 caffeine, and it has a potentially longer half-life because of interactions with other
23 plant compounds.  Monster Energy Drinks contain guarana.

24

25

26

27

28

8

CLASS ACTION COMPLAINT

**C.    Defendants' Labeling, Advertising and Marketing of the Monster Energy Drinks Targets, Is Intended to and Does Connect Directly with Teenagers and Youth**

24.    Defendants designed the marketing, advertising and labeling of the Monster Energy Drinks for an intended audience of adolescents and youth. Indeed, the Company reportedly selected the name "Monster Energy" after consulting with a focus group of teenage males.    The dominant audience for Monster Energy Drinks is made up of teens and people in their early 20s.    As detailed below, the Company's unique marketing approach designed to be attractive to adolescents and youth, has caused Monster Energy Drinks to become No. 1 in energy-drink convenience-store sales, generating $1.3 billion in 2011 revenue and taking market share from Red Bull.

25.    The Company eschews mainstream advertising on TV, radio, and billboards, instead sponsoring huge extreme sporting events – skateboarding, motorcycle racing, surfing, NASCAR racing, professional bull riding – and music festivals as well as getting endorsements from music celebrities and popular sports figures.    The core of Defendants' marketing strategy is prize promotions, price promotions, competitions, endorsements from selected public and extreme sports figures, personality endorsements (including from television and other well-known sports personalities), coupons, sampling and sponsorship of selected causes, events, athletes and teams.

26.    The Company also admits in its public filings that its sales and marketing strategy is to develop "brand awareness through image enhancing programs and product sampling."    Defendants use branded and other promotional vehicles at events and schools where they hand out samples of Monster Energy Drinks to consumers.    Similarly, the Company goes into small local towns and

9

cities – at sports and music festivals – handing out Monster Energy Drinks to everyone – age being no bar to the freebie handout.

27.    Defendants' promotions include extreme sports, music and the Monster Girls.  Reproduced below are screen shots of the Monster Girls from the Company's website – beautiful, sexy and scantily clad young women.   What sexually curious adolescent male (i.e. the Company's focus group) would not be drawn to Monster Energy Drinks with this kind of marketing?



28.    The Company's promotions offering free Monster gear require a person to "Drink Monster," "Save Tabs," and "Trade for Gear.  *See* below.  The gear includes Monster-branded clothing and apparel, accessories as well as the Monster Girl 18-Month Calendar:

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11



12  In this manner, Defendants not only encourage, but aggressively promote the
13  consumption of Monster Energy Drinks by teenagers and other youth.   For
14  example, in order to get a "free" Monster Beanie (with the florescent Monster
15  logo) or a short-sleeve T-shirt, one has to consume and send in 30 Monster Energy
16  Drink tabs!!  A hoodie demands consumption of 75 Monster Energy Drinks!!  So,
17  in effect, the gear is not actually "free."   One has to pay for and consume a
18  monstrous number of Monster Energy Drinks.

19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT





29.   The "Monster Music" and "Monster Gaming" Facebook pages are most popular with persons ages 13-17.   Indeed, the Monster Army website sponsored by Defendants invites "13-21" year-old action sports athletes to apply for sponsorships, and ages 13-24 is the most popular age group of those who

12

"Like" the "Monster Army" on Facebook.   Monster Army is the Company's athlete development program that supports athletes ages 13-21 in moto, bike, skate, surf, snow and wake.   Athletes from all over the world are evaluated and invited into the program to represent the Monster Energy brand.   *See* http://www.monsterarmy.com/programs/, reproduced below:



30.    In keeping with a young fan-base, the Company has nurtured a strong following on social networks.  It counts over 20 million enthusiasts on Facebook and has over 408,000 Twitter followers.  The Company, thus, specifically targets the 13-21 age group in its marketing and advertising knowing full well that the fans of the athletes in this age group will most likely also be 13-21 or younger.

31.    Jeff Cioletti, editor of industry trade publication *Beverage World*, attributes Monster Energy Drinks' success to the Company "knowing its audience and finding a way to connect with them, in what they perceive as an authentic way, and not talking down to them."  On the Company's marketing strategy, Mark Hall, president of the Monster Energy division, remarked:   "There has to be some

13

CLASS ACTION COMPLAINT

connection with the consumer – they have to feel good about what they hold in their hand and that's the elusive part of marketing."

32.    There's no question that the Company has done a remarkable job of connecting with its young audience.  According to a 2011 article by the American Academy of Pediatrics, 30% to 50% of adolescents and young adults consume energy drinks.

33.    Ads in magazines and on billboards with slogans like "unleash the beast" and "the meanest energy supplement on the planet" ensure that consumers have brand awareness.  And one certainly cannot miss Monster Energy Drinks on the shelves; with the goth-inspired logo, lurid colors, and names like Java Monster, Lo-Carb Monster, Monster Rehab, and others, they tend to stand out. And Defendants' banners adorn pretty much every big extreme sports event.   The "coolness factor" and the caffeine in Monster Energy Drinks are what the Company is banking on to keep its young consumers coming back for more.

**D.    The Labeling on Monster Energy Drinks Is Designed to Be Attractive Primarily to Adolescents and Youth**

34.    The label on a can of Monster Energy Drinks states:

Tear into a can of the meanest energy

supplement on the planet, Monster energy.

It's the ***ideal combo of the right***

***ingredients in the right proportion to***

***deliver the big bad buzz that only***

***Monster can.***

Monster packs a vicious punch but has a

smooth flavor you can really pound down.

***Athletes, musicians, anarchists, students,***

***road warriors, metal heads, nihilists,***

14

CLASS ACTION COMPLAINT

1

2

*geeks, hipsters, bikers, and milfs dig it.*

*You will too.*



It is commonly known that MILF is an acronym for "Mother/Mom I'd Like to F*#k." *See* en.wikipedia.org/wiki/MILF.  One can only imagine what message the Company is conveying with labeling like that and the Company's intended target audience of sexually curious adolescents with raging hormones.

35.    In its web advertising, the Company also states:  "It's a wicked mega hit that delivers *twice the buzz* of a regular energy drink."   The Company's

15

repeated reference to "buzz," a term generally used to describe the intoxicating effect one has from drinking alcohol, gives the impression to the consumer that Monster Energy Drinks can similarly deliver the intoxicating feeling that comes from drinking alcohol.

36.    Consumers may, thus, falsely believe that "more is better" and ingest multiple servings of the energy drinks.  Moreover, since there are no restrictions on the sale of energy drinks, adolescents and children (who may be inexperienced and less tolerant to the effects of caffeine) may be at an increased risk for caffeine intoxication.  Indeed, the Company's 24 oz. can of the original Monster Energy Drink states:  "[B]igger is better . . . because you can never get too much of a good thing."



37.    Some examples of the labeling and advertising for the Company's other Energy Drinks that convey similar messages include:

CLASS ACTION COMPLAINT

- LO-CARB Slogan: Tear into a can of the meanest energy supplement on the planet, Lo-Carb MONSTER energy. We went down to the lab and performed major surgery on the Monster. We hacked out carbohydrates and calories, *transplanted the wicked Buzz* and dialed in the flavor. Lo-Carb MONSTER energy still *delivers twice the Buzz* of a regular Energy drink, but only has a fraction of the calories.

- Cuba Lima Monster Energy Slogan:  As legend has it *a buzzed up Cuban hears his country has been liberated holds up his drink, yells "CUBA-LIBRE" and the famous cocktail is born.  As big fans of the drink we decided to make our own, substituting our tried and true energy blend for the alcohol and adding a squeeze of sweet lime.*  We know it sounds crazy but don`t knock it till you try it. *You`re gonna love it cause it`s a new kind buzz.*  Energy Liberated!

- Übermonster Monster Energy Slogan:  Über: (oo-ber) From the German meaning superior, above the norm, or the ultimate.  *No regular bottle could handle this evil energy brewski.* So we designed our own with the biggest *chugger friendly* wide mouth we could make. The big ass cap is a little hard to pry off, but it's sorta like, if you can't open it you shouldn't be able to drink it!  Cheers, This energy brew's for you!

- M3 Monster Energy Slogan:  This little bottle of super concentrated Monster madness packs a 16oz. punch into only 5oz. of liquid. Our unique nitrous technology mellows

17

CLASS ACTION COMPLAINT

out the flavor.  *A shot it's not . . . but then you don't have to plug your nose to drink it!*

- Super Dry Nitrous Slogan:  Don't let the skinny can fool you, Monster Extra Strength packs our biggest punch! Call us crazy, but we supercharged our Monster Energy base then injected it with Nitrous Oxide for a unique texture, smooth drinkable flavor and *buzz that's bigger than ever. This is no "Whip-it" but it will whip you good...*

- Green Tea Rehab Slogan:  *Our friends at the Rehab pool party in Vegas know all about recovering from a long night* and together we came up with Monster Rehab® Green Tea + Energy.  Naturally loaded with EGCG antioxidants, infused with coconut water, quercetin, acai berry and goji berry. Monster Rehab® Green Tea + Energy delivers a triple threat that quenches thirst, hydrates like a sports drink, and brings you back after a hard day`s night.  Monster Rehab® Green Tea + Energy: RE-FRESH, RE-HYDRATE, RE-VIVE, or in other words, Re-habilitate with a killer mix of green tea,  pineapple juice, electrolytes, and our bad-ass Monster Rehab® energy blend to fire you up.  Rehab The Beast!

- Tea+Lemonade Rehab Slogan: *While chillin' at the Vegas Rehab® pool party, contemplating a cure for cotton mouth, admiring the flesh parade,* and pondering the wisdom of doubling down when the dealer shows a face card, it HIT ME!  We need a new drink. One that can do it all – a triple threat that quenches thirst, hydrates like a sports

18

drink, and brings you back after a hard day's night. Monster Rehab: Re-Fresh, Re-hydrate, Re-store, or in other words, Re-habilitate with a killer mix of tea, lemonade, electrolytes, and ***our bad-ass Rehab® energy blend*** to fire you up. Rehab the Beast!

38.    In sum, the Company's labeling conveys the following:

- Monster Energy Drink is some magic formula with "the right ingredients in the right proportion;"
- Monster Energy Drink delivers "a big bad buzz" like you get from drinking alcohol; and
- You can become part of the "cool" or "Über-cool" crowd by imbibing Monster Energy Drinks.

**E.    Defendants' Labeling, Advertising and Marketing of Their Energy Drinks Is False and Misleading and Fails Adequately to Warn of Dangers of Frequent and Excessive Consumption of Caffeine**

39.    Monster Energy Drinks contain significantly high amounts of caffeine, in addition to other stimulants, like guarana, which contain hidden amounts of additional caffeine. The amino acid – taurine – is also found in the Monster Energy Drinks. Although the Company does not identify the amount of caffeine in each can, it has disclosed through other sources that one 16 oz. can of Monster Energy Drink contains approximately 160 milligrams of caffeine – the equivalent of four (4) 12 oz. cans of Coca-Cola, while the 24 oz. can contains 240 milligrams of caffeine, or the equivalent of seven (7) cans of Coke. But health experts have voiced concerns about energy drinks over the past few years, saying the caffeine content can be as high as 550 mg.[1]

---

[1] Many of the Monster Energy Drinks have the same caffeine content per ounce, but some are slightly higher due to the same energy blend being used in drinks

19

40.     Defendants have proven that they have marketing genius and this genius has been resoundingly rewarded by the market – both its shareholders as well as by the Company's target group – adolescents.  Notwithstanding the high caffeine levels in Monster Energy Drinks and scientific evidence of the serious health risks that they pose, especially for the teenagers and youth that the Company specifically targets (as detailed *supra*), Monster Energy Drinks fail miserably in providing any warnings on its product as to the effects of frequent or excessive caffeine consumption to the teenagers and youth it targets.

41.     The only notation that the Company has on Monster Energy Drink can is hidden in fine print:

> Consume responsibly – Max 1 can per four hours, with limit 3
> cans per day.  Not recommended for children, people sensitive
> to caffeine, pregnant women or women who are nursing.

_____

with less volume.  The caffeine content is less per ounce in countries with stricter caffeine laws such as Australia and New Zealand which indicates Defendants' knowledge and awareness of the impact of excessive caffeine consumption.

CLASS ACTION COMPLAINT



42.    Monster Energy Drinks can labels have <u>NO WARNING</u> for the teenagers and adolescents who the Company targets.  Children are deemed to be persons under the age of 12.

43.    Three 16 oz. cans contain, even by Defendants' standards, more than 480 mg of caffeine, significantly more than the 400 mg that that the Federal Drug Administration ("FDA") has stated is safe for healthy adults to consume.  The safe level for adolescents according to the American Academy of Pediatrics is much

21

CLASS ACTION COMPLAINT

lower – no more than 100 mg of caffeine per day from all sources.  According to the University of California, teenagers who consume more than 100 mg of caffeine per day are at an increased risk for high blood pressure.  One study in *Pediatrics*, a medical journal, says, "Caffeine can be lethal in doses ranging from 200 to 400 milligrams," and affects various organ systems by increasing heart rate, blood pressure, speech rate, motor activity, attentiveness and body temperature.  Thus, drinking even one can of a Monster Energy Drink is unhealthy for an adolescent.

44.   Remarkably, in a recent press release, the Company contends that "more than eight billion cans of Monster Energy® that have been sold and *safely consumed* in the United States and around the world since 2002."  That statement is simply untrue.

45.   Monster Energy Drinks have been cited in the deaths of five people in the past year, according to incident reports that doctors and companies submit to the FDA.  According to Shelly Burgess, an FDA spokeswoman, the reports said the victims consumed Monster Energy Drinks prior to their deaths.  The five death reports, and a sixth in 2009, were among 37 adverse reaction reports since 2004 that mentioned Monster Energy Drinks, according to a log of incidents that health professionals, companies and the public voluntarily recorded with the FDA.  *See* excerpt attached hereto as Exhibit A.  The event reports linked to the Company claimed that some of the life-threatening illnesses were characterized by heart attack, chest pain and vomiting.

46.   A November 2011 report by the Drug Abuse Warning Network, produced under the auspices of the Department of Health and Human Services, showed a tenfold increase in emergency room visits linked to energy drinks from 2005 (1,128 visits) and 2008 and 2009 (16,053 and 13,114 visits, respectively), representing about a tenfold increase, with about half those trips made by patients 18 to 25 years old.  Meanwhile, sales of energy drinks have increased 240% in the

22

CLASS ACTION COMPLAINT

same period.  "Consumption of energy drinks is a rising public health problem because medical and behavioral consequences can result from excessive caffeine intake," the report concluded.  "A growing body of scientific evidence documents harmful effects, particularly for children, adolescents and young adults."

47.    Recently, the parents in Maryland sued MBC claiming the drinks led to caffeine toxicity that killed their daughter.  Fourteen year-old Anais Fournier, who had a pre-existing heart condition, went into cardiac arrest after drinking two 24-ounce cans of the Monster Energy Drinks two days in a row in December 2011.  She was pronounced brain dead six days later.

48.    Health advocates and experts have been concerned about the use of energy drinks among adolescents and trying for some time now to draw attention to the issue of energy drink consumption by kids.  In 2011, the *Journal of Pediatrics* published a report titled, "Health Effects of Energy Drinks on Children, Adolescents, and Young Adults" warning that the consequences of energy drink consumption included "palpitations, seizures, strokes, and even sudden death."  The authors also specifically warned parents that the drinks could be dangerous for kids with heart problems, diabetes, or ADHD.

49.    Earlier this year, the National Council of Sports and Fitness issued a report, "Youth and Energy Drinks," warning that kids confuse energy drinks like Monster Energy Drinks with the sports drinks marketed by their sports heroes.  Sports drinks contain water, salt and sugar, and are designed to replenish the electrolytes and energy one's body loses during exercise.  Sports drinks do not contain chemicals that directly increase one's energy levels as energy drinks do.  Defendants' product placement in the vicinity of sports drinks is by design.  *See* product placement below:

CLASS ACTION COMPLAINT

23



50.    According to the 2009 Mayo Clinic study, convenience stores display energy drinks next to the sports drinks, which can mislead the consumer into thinking that they are similar products.  The study notes that whereas sports drinks can indeed provide hydration and replenishment of electrolytes and carbohydrates, the elevated levels of caffeine in energy drinks have diuretic effects that increase urinary output and natriuresis (excretion of an excessively large amount of sodium in the urine).  Additionally, according to the National Federation of High School Associations, energy drinks supply an amount of carbohydrate far beyond that is

24

recommended for physically active people, which can slow the rate at which fluid is absorbed into the bloodstream or lead to gastrointestinal distress.

51.   Amelia M. Arria, Ph.D., an epidemiologist who serves as director of the Center on Young Adult Health and Development at the University of Maryland School of Public Health stated: "In my opinion, some of the marketing messages go overboard about the health benefits of these drinks. The term 'energy drink' is misleading.  Energy should come from calories – this is more about stimulation." Studies have shown almost 30% of college students consume energy drinks regularly, Dr. Arria said.  The high concentrations of caffeine they contain can produce cardiovascular complications, especially in young people or those who are sensitive to caffeine, she said.

52.   According to a 2011 article by the American Academy of Pediatrics, of the 5,448 U.S. caffeine overdoses reported in 2007, 46% occurred in those younger than 19 years.  The researchers of the 2011 study concluded, among other things that:

- *energy drinks have no therapeutic benefit*, and both the known and unknown pharmacology of various ingredients, combined with reports of toxicity, suggest that these drinks may put some children at risk for serious adverse health effects;

- typically, energy drinks contain high levels of caffeine, taurine, and guarana, which have stimulant properties and cardiac and hematologic activity, but manufacturers claim that energy drinks are nutritional supplements, which shields them from the caffeine limits imposed on sodas and the safety testing and labeling required of pharmaceuticals; and

- youth-aimed marketing and risk taking adolescent developmental tendencies combine to increase over-dose potential.

25

CLASS ACTION COMPLAINT

53.     According to medical experts at the Department of Psychiatry and Behavioral Sciences at The Johns Hopkins University School of Medicine, the consumption of energy drinks may increase the risk for caffeine overdose in caffeine abstainers as well as habitual consumers of caffeine from coffee, soft drinks, and tea due to the lack of adequate labeling.  Many energy drinks do not label their product with the amount of caffeine or display warning labels advising proper use.  Consequently, consumers may be completely unaware of the amount of caffeine they are ingesting.

54.     Additionally, the potential for acute caffeine toxicity due to consumption of energy drinks may be greater than other dietary sources of caffeine since many energy drinks are marketed with claims of performance enhancing effects although the existence and extent of such effects has not been conclusively established.

55.     The Federal Food, Drug and Cosmetics Act provides in section 201(n) (21 U.S.C. §321(n)) that affirmative representations are not the only factor relevant to whether labeling is misleading.  Rather, in determining whether the labeling of an article is misleading,

> there shall be taken into account (among other things) . . . the extent to which the labeling fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling relates under the conditions of use prescribed in the labeling thereof or under such conditions of use as are customary or usual.

21 U.S.C. §321(n).

56.     While touting the questionably positive qualities of Monster Energy Drinks, the Company fails to adequately warn of the dangers of consuming even

26

one can of the Monster Energy Drinks to the adolescents and youth that they target with their promotions and overall marketing strategy.  Thus, Company's labeling of its Monster Energy Drinks is false and misleading.

**F.    Defendants' Failure to Properly Label Monster Energy Drinks Has Caused Serious Bodily Injury to Some Consumers and Continues to Pose a Danger to the Adolescents and Youth that They Target in the Company's Marketing Campaign**

57.    Monster Energy Drinks are targeted towards people with active lifestyles, especially teenagers and young adults.  They are, however, a potent beverage that can cause adverse health conditions, especially in teenagers and adolescents who are still in the process of developing.

58.    Monster Energy Drinks can raise one's heart rate.  The University of Washington reports that caffeine is a central nervous system stimulant and can increase one's heart rate.  According to the University of Alabama at Birmingham, guarana has three times the caffeine content as caffeine in coffee.  According to Johns Hopkins University, in a survey of 496 college undergraduate students, 19% of students indicated that they experienced heart palpitations from energy drinks.  The American Heart Association confirms this, noting that people consuming two energy drinks everyday experienced blood pressure and heart rate increases.  The American Heart Association states that energy drinks can pose an increased risk of heart problems during exercise, as one's heart rate naturally increases on its own during physical activity.  High blood pressure, also known as hypertension, puts one's body at risk for numerous additional illnesses.  Having high blood pressure can harden one's arteries, strain one's kidneys and cause permanent damage to one's heart.

59.    In 2007, Wayne State University in Michigan conducted a study on how energy drinks might affect blood pressure and the heart.  Participants, who

27

were in their 20s, drank two energy drinks a day for seven days straight. The participants did not consume caffeine for two days prior to the study. Heart rates were measured each day within two hours of consuming the energy drinks, while the participants were sitting down and not engaged in any strenuous activity. The results showed that there was an average heart rate increase of 11% on the seventh day, an increase of up to seven beats per minute. Blood pressure also increased by over 7%, which signified the added pressure to the heart.

60. James Kalus, Pharm.D., senior manager of Patient Care Services at Henry Ford Hospital in Detroit, Michigan, and a former Wayne State University researcher who led the study, feels that the increases in blood pressure and heart rate may be due to the caffeine and taurine in the drinks. "Thousands of young adults are using these drinks," Dr. Kalus said. "Some are mixing the energy drinks with alcohol. We don't necessarily know how much they are drinking at a time or whether they are drinking before exerting themselves playing basketball or dancing." This is especially so since the marketing for energy drinks is combined with extreme sports, he said.

61. Dr. Suzanne Steinbaum, a preventive cardiologist at Lenox Hill Hospital in New York City. "People may think that these energy drinks are healthy by the way they're marketed," she said. There are, however, 240 milligrams of caffeine in some of these drinks, Dr. Steinbaum said. "That's seven times the amount of caffeine in a can of soda," she added. Caffeine can increase the heart rate tremendously and drive blood pressure up, Dr. Steinbaum explained.

62. Energy drinks cause drastic changes in energy levels. Caffeine's primary effect on the body is to stimulate the nervous system, producing a burst of energy, but this is followed by a period of diminished energy. These episodes were referred to as jolts and crashes, respectively, in a study published by "Nutrition Journal" in October 2007. Results of this study, which included almost

CLASS ACTION COMPLAINT

500 college students, indicated that jolts and crashes were experienced by 29% of subjects who drank energy drinks.  In addition, 22% experienced headaches and 19% experienced heart palpitations.

63.     The high sugar and caffeine content in Monster Energy Drinks can keep one wired for hours and cause sleep deprivation.  Medline Plus reports that caffeine is absorbed by one's body quickly and distributed through the bloodstream.  From this point, it quickly accesses one's brain.  This can cause the caffeine to have an effect for hours after one drinks it.  Monster Energy Drinks also contain additional ingredients such as carnitine, guarana, ginseng and taurine, each of which is believed to increase one's energy which may be disruptive to sleep.

64.     Another side effect of Monster Energy Drinks is dehydration.  Amy Peak, an assistant professor at Butler University's College of Pharmacy and Health Sciences, reports that the combination of caffeine and guarana in energy drinks can lead to dehydration.  According to Brown University, the caffeine in energy drinks acts as a diuretic and can leave you severely dehydrated.  This is particularly concerning where one uses Monster Energy Drinks as a pre-workout dietary supplement.

65.     According to a 2009 study by the Mayo Clinic, regulation of energy drinks, including content labeling and health warnings are the laxest in the United States.[2]    According to the study, this absence of oversight has resulted in

---

[2] This is underscored by the FDA's response to certain senators' requests on the FDA to investigate health risks associated with mixing caffeine and other stimulants.  The FDA said it had not found any safety studies that showed the mix of ingredients in energy drinks to be dangerous, but conceded that their preliminary review may be greatly enhanced by engaging specialized expertise outside the FDA, focusing particularly on the *vulnerability of certain populations to stimulants and the incidence and consequence of excessive consumption of energy drinks, especially by young people*.  The FDA assured the senators that it was continuing its investigation and that if it did find such risks in its ongoing research into the products, it would consider taking regulatory action.  Most importantly, the FDA acknowledged that resource and capacity constraints

29

aggressive marketing of energy drinks, targeted primarily toward young men and openly promoting psychoactive, performance-enhancing, and stimulatory effects. Alarmingly, energy drink consumption has been shown to be positively associated with high-risk behavior, including marijuana use, sexual risk taking, fighting, failure to use seat belts, and taking risks on a dare, as well as with smoking, drinking, problems stemming from alcohol abuse, and illicit drug use.

66.    There appears to be no alcohol in Monster Energy Drinks.  However, some clinical studies have demonstrated a relationship between energy drink consumption and alcohol abuse.  According to a study published in the February 2011 issue of "Alcoholism, Clinical and Experimental Research," energy drink consumption appears to be a risk factor for alcohol dependence.  Specifically, college students who reportedly drank energy drinks daily or weekly, were more likely to report consuming alcohol more frequently and in greater amounts, than students who drank energy drinks less than once a week or not at all.

67.    Monster Energy Drinks' addiction can be a problem for teens, adolescents and older working adults since caffeine is known to be addictive. Adolescents and adults may be consuming this beverage and the drug it contains – caffeine – to fight for increased energy and stamina.  Monster Energy Drinks abound, including lo-cal and lo-carb mixes, all packaged in the conspicuous black can sporting the 𝍬.

_____

preclude the government or government-funded toxicity testing of all possible combinations.

30

CLASS ACTION COMPLAINT

**G.   Defendants Have Profited Immensely from Their False and Misleading Labeling and Advertising**

68.    Defendants' unique approach to labeling, print and internet advertising, promotion and general marketing of the Monster Energy Drinks has been immensely profitable.  MBC is one of the fastest growing public companies.

69.    Defendants boast that more than 8 billion cans of Monster Energy® have been sold and consumed in the United States and around the world since 2002.

70.    Indeed, of the Company's two reportable segments – DSD, whose principal products comprise Monster Energy Drinks, and Warehouse, whose principal products comprise juice based and soda beverages – the Company's DSD segment represented 94.4%, 93.0% and 91.4% of the Company's consolidated net sales for the years ended December 31, 2011, 2010 and 2009, respectively. Monster Energy® Drinks represented 91.2%, 89.9% and 90.0% of the Company's net sales for the years ended December 31, 2011, 2010 and 2009, respectively. These figures demonstrate that Monster Energy Drinks are materially significant to the very existence of the Company.

71.    Further, in filings with the Securities and Exchange Commission, the Company states that its gross profit for the year ended December 31, 2011, was $894.3 million, an increase of approximately $214.1 million, or 31.5% higher than the gross profit of $680.2 million for the year ended December 31, 2010.  The Company admits that the increase in gross profit dollars was primarily the result of the $446.7 million increase in gross sales of Monster Energy® brand energy drinks.  Gross sales were $1,488.5 million for the year ended December 31, 2010, an increase of approximately $179.2 million, or 13.7% higher than gross sales of $1,309.3 million for the year ended December 31, 2009.  Again, the increase in the gross sales of the Monster Energy® brand energy drinks represented

31

approximately $162.1 million, or 90.5%, of the overall increase in gross sales in 2010. The increase in gross sales and hence gross profits for other relevant years is also directly attributable to Monster Energy Drinks.

72.    The Company's public filings recognize the risk that because Monster Energy Drinks currently generate the vast majority of revenues (over 94% in 2011), any criticism of the Monster Energy Drinks, whether by healthcare professionals of the nutritional benefits the Monster Energy Drink, could result in decreased demand, which in turn could have an adverse effect on Defendants' future business and financials.

73.    The Company also acknowledges that there are currently pending proposals to enact legislation to limit or restrict the sale of energy drinks generally to minors and/or persons below a specified age and/or the venues in which energy drinks can be sold and/or impose taxation on the sale of energy drinks. Defendants concede that should these proposals succeed, any such legislation would result in a reduction in demand for Monster Energy Drinks and adversely affect the Company's profit margin. Thus, by its own admission, Monster Energy Drinks and their continued availability to all – even minors, teens, and youth – are vital to the Company's continued success, and even to its very existence.

**H.    The Company's Energy Drink Labeling Has Been Under Investigation by Various Regulators**

74.    Defendants have so far evaded any meaningful regulation of their product by the FDA primarily by classifying Monster Energy Drinks as a "dietary supplement," i.e., not a conventional "food" or "beverage." Ordinarily the FDA evaluates the safety of ingredients for beverages or other conventional foods (including "energy drinks" represented as beverages, which are conventional foods) through food additive pre-market programs that generally focus on individual ingredients that may be used in a range of food, rather than on a

32

CLASS ACTION COMPLAINT

product-specific basis.   The FDA concedes that it does not have authority to require a manufacturer to submit each formulated product for pre-market review.

75.    Defendants have relied on this gray area to circumvent applicable standards by marketing the Monster Energy Drinks akin to a beverage or sports drink, but not being subject to regulation by classifying them as a "dietary supplement."

76.    In July 2012, the Company was subpoenaed by the New York attorney general in connection with an investigation into its advertising, marketing, promotion, ingredients, usage and sale of its Monster Energy Drinks, specifically whether the Company was misleading consumers about how much caffeine the drinks contain and the health risks they could pose.   The attorney general investigation focuses, among other things, on whether Defendants (and other companies) violated federal law in promoting the drinks as dietary supplements rather than as foods, which are regulated more strictly.

77.    State investigators are also examining whether all of the ingredients that go into the beverages are properly disclosed particularly since some additives, like black tea extract and guarana, may contain additional caffeine that is not reflected when the drinks are labeled.

78.    In an October 31, 2012 letter, the City Attorney of San Francisco, Dennis J. Herrera, sent a letter to MBC demanding that it provide evidence that supports the advertising and marketing claims it makes to adolescents for its energy drinks and to substantiate its claim that large daily quantities of Monster Energy Drinks were safe for adolescents and adult, including claims that consumers of Monster Energy Drinks:

- "[C]an never get too much of a good thing!"
- "3 cans per day" of 16 oz. Monster is "responsible" or safe consumption by adolescents and adults

CLASS ACTION COMPLAINT

- "[B]igger is better"
- "2 cans per day" of 24 oz. Monster is "responsible" or safe consumption by adolescents and adults
- Monster and Monster Mega are safe for consumption except for "children, pregnant women or people sensitive to caffeine."

79.   Mr. Herrera observed that MBC seems to have chosen to label its Monster Energy Drinks as a "dietary supplement" rather than as a conventional food or beverage in an attempt to circumvent the safety standards required for food and beverage additives.  Mr. Herrera's letter noted that Monster Energy Drinks did not meet the definition of a "dietary supplement."  He remarked:

> As the FDA has explained, "the packaging of liquid products in bottles or cans similar to those in which single or multiple servings or beverages like soda, bottled water, fruit juices, and iced tea are sold, suggests that the liquid product is intended for use as a conventional food."  Monster is marketed in a single serving can similar in size, shape and appearance to conventional beverages. . . .

80.   Mr. Herrera also pointed out that the fact that MBC refers to its products as "Monster Energy *drinks*," and states that "Monster Energy delivers 'twice the buzz of a regular energy drink,'" belied any notion that "[MBC's] products are not beverages."  Indeed, the Company's public filings reinforce this – nowhere in its public filings does the Company refer to Monster Energy Drinks as a "dietary supplement."  In describing its signature Monster Energy® Drink, the Company states:  "In 2002, we launched a new carbonated energy drink under the Monster Energy® brand name in 16-ounce cans . . . . Our Monster Energy® drinks contain vitamins, minerals, nutrients, herbs and supplements (collectively, 'supplement') and are marketed through our full service distributor network."

34

81. In his letter, Mr. Herrera also noted that

[d]espite exceedingly high caffeine levels, Monster Beverage Corporation encourages unsafe and irresponsible consumption of Monster Energy products.  Monster's labeling recommends that individuals consume no more than three 16 oz. cans or two 24 oz. cans per day, which amounts to a total of 48 oz. of Monster per day.  But 48 oz. of Monster contains 480 mg of caffeine, nearly five times the caffeine that is safe for adolescents to consume in an entire day, and more than the 400 mg per day the FDA has indicated is safe for healthy adults.

82. Mr. Herrera further noted that "[r]ather than warning consumers to exercise constraint or caution, Monster's marketing states that 'bigger is always better' and 'you can never get too much of a good thing.'"  The Company urges consumers to "chug it down," or "throw [it] back."  The Company states that its product has a "smooth flavor you can really pound down," and that one of its products has "the biggest chugger friendly wide-mouth we could make."

83. While Monster Energy Drink competitors like Red Bull, NOS, Full Throttle and Amp are marketed as beverages, the Company continues to market Monster Energy Drinks as dietary supplements.

84. Many other countries require the Company to sell Monster Energy Drinks as food.  In Canada, Monster Energy Drinks were recently reclassified as food, and thus are subject to regulation by Health Canada.  On January 1, 2011, the Mexican legislature imposed a 25% excise tax on energy drinks based on caffeine content.  In response Defendants adjusted the caffeine levels in Monster Energy Drinks that are sold in Mexico to address this legislation.  In 2011, Hungary implemented a tax on energy drinks and the Company responded by adjusting the caffeine content in Monster Energy Drinks sold in Hungary.

35

CLASS ACTION COMPLAINT

## CLASS ACTION ALLEGATIONS

85.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this class action and seeks certification of a class comprised of:

> All persons who, during the Class Period (four years from the
> date of this Complaint to the present) purchased any Monster
> Energy Drinks for personal use and not for purposes of further
> retail sale or distribution (referred hereinafter as the "Class").

86.     For purposes of this class definition, the term "Monster Energy Drinks" includes Monster Energy®, Lo-Carb Monster Energy®, Monster Energy® Assault®, Monster Khaos®, Monster M-80®, Monster MIXXD®, Monster Energy® Absolutely Zero, Monster Energy® Import Light, Monster Energy® Dub Edition, Monster Rehab™ Tea + Lemonade + Energy, Monster Rehab™ Rojo Tea + Energy, Monster Rehab™ Green Tea + Energy, Monster Rehab™ Protean + Energy, Monster Energy® M3™ Super Concentrate, Java Monster® Kona Blend, Java Monster® Loca Moca®, Java Monster® Mean Bean®, Java Monster® Vanilla Light, Java Monster® Irish Blend®, Java Monster® Toffee, Monster Energy® Import, Monster Energy Extra Strength Nitrous Technology® Super Dry™, Monster Energy Extra Strength Nitrous Technology® Anti-Gravity®, Monster Energy Extra Strength Nitrous Technology® Killer B®, Monster Energy Extra Strength Nitrous Technology® Black Ice™, X-Presso Monster® Hammer, X-Presso Monster® Midnite.

87.     Excluded from the definition of the Class are:   Defendants, Defendants' employees, any entity in which Defendants have a controlling interest or which holds a controlling interest in Defendants, including, but not limited to, any warehouses or distributors in which Defendants have a controlling interest during the Class Period and Defendants' legal representatives, assigns and successors; all persons who make a timely election to opt out of the proposed

36

CLASS ACTION COMPLAINT

1    Class, and governmental entities, including the Judge and the judicial staff
2    assigned to this case.

3        88.    Subject to additional information obtained through further
4    investigation and discovery, Plaintiff may expand or narrow the foregoing
5    definition by amendment or amended complaint, as permitted by the Court.

6        89.    The Company's practices and omissions apply uniformly to all
7    members of the Class, so that the questions of law and fact are common to all
8    members of the Class.  All members of the Class were and continue to be similarly
9    affected by not receiving disclosure of the risks associated with consuming
10   Monster Energy Drinks, and the relief sought herein is for the benefit of Plaintiff
11   and members of the Class.  Defendants' marketing, advertising and promotional
12   practices as detailed above applied uniformly to all members of the Class
13   throughout the Class Period, so that the questions of law and fact detailed herein
14   are common to all members of the Class.

15       90.    All Class members were and are similarly affected by purchasing
16   Monster Energy Drinks for their intended and foreseeable purpose as promoted,
17   advertised, packaged, and labeled by Defendants' and as set forth in detail above.

18       91.    The proposed Class is so numerous that joinder of all members would
19   be impracticable.  Based on the annual sales of Monster Energy Drinks and their
20   popularity, it is apparent that the number of consumers of Monster Energy Drinks
21   would be so large as to make joinder impossible.  Moreover, the Company
22   concedes that it had sold over 8 billion cans of Monster Energy Drinks since 2002.

23       92.    Questions of law and fact common to the Class exist that predominate
24   over questions affecting only individual members, including, *inter alia*:

25           (a) Whether Defendants' practices, representations or omissions in
26               connection with the packaging, labeling, advertising, marketing,
27
28

                                         37
CLASS ACTION COMPLAINT

promotion and sale of Monster Energy Drinks were false, misleading or likely to deceive or confuse consumers;

(b) Whether Defendants' practices, representations or omissions in connection with the packaging, labeling, advertising, marketing, promotion and sale of Monster Energy Drinks violated the MMWA, 15 U.S.C. §2301, *et seq.*;

(c) Whether Defendants' practices, representations or omissions in connection with the packaging, labeling, advertising, marketing, promotion and sale of Monster Energy Drinks was unfair, deceptive or unlawful or in any respect, thereby violating California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §17200, *et seq.*;

(d) Whether Defendants' practices, representations or omissions in connection with the packaging, labeling, advertising, marketing, promotion and sale of Monster Energy Drinks was unfair, deceptive or unlawful or in any respect, thereby violating California's UCL, Bus. & Prof. Code §17500, *et seq.*;

(e) Whether Defendants' practices, representations or omissions in connection with the packaging, labeling, advertising, marketing, promotion and sale of Monster Energy Drinks violated California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750, *et seq.*;

(f) Whether Defendants failed to disclose, or adequately disclose, the amount of caffeine in Monster Energy Drinks or the risks associated with caffeine as used in Monster Energy Drinks;

CLASS ACTION COMPLAINT

(g) Whether Defendants failed to disclose, withheld or misrepresented material information regarding the health effects on Monster Energy Drinks is an effort to deceive consumers;

(h) Whether Defendants' Monster Energy Drink labels were false and misleading because they failed to warn the teenagers and youth the Company was targeting with its advertising, marketing and promotions, of the risks of frequent and excessive consumption of energy drinks;

(i) Whether Defendants acted intentionally in their deceptive and false advertising, marketing, promotion and sale of Monster Energy Drinks;

(j) Whether Defendants' practices, representations or omissions deceived or have the capacity to deceive;

(k) Whether Defendants breached express and implied warranties in connection with the packaging, labeling, advertising, marketing, promotion and sale of Monster Energy Drinks;

(l) Whether Defendants knew or should have known of the false and misleading nature of its advertising and labeling before putting the Monster Energy Drinks subject to such advertising and labeling into the stream of commerce for purchase and use by Plaintiff and the Class;

(m)   Whether Defendants' conduct described above resulted in ill-gotten gains and, if so, the extent of the ill-gotten gains; and

(n) Whether Defendants' conduct as set forth above injured consumers and, if so, the nature and extent of the injury; and

(o) Whether, and to what extent, injunctive relief should be imposed on Defendants to prevent such conduct in the future.

39

CLASS ACTION COMPLAINT

93.    The claims asserted by Plaintiff in this action are typical of the claims of the members of the Class, as the claims arise from the same course of conduct by Defendants, and the relief sought is common.  The misrepresentations and omissions as to Plaintiff when he purchased Monster Energy Drinks are similar to the misrepresentations and omissions made to other Class members across the country.  Plaintiff and all Class members have suffered economic injury as a result of Defendants' misrepresentations and omissions, and the Company has realized massive ill-gotten gains associated with the sale of its Monster Energy Drinks. Absent this class action, the members of the Class will continue to suffer losses and the violations of law described herein will continue without a practical remedy, and Defendants would unjustly retain the proceeds of their ill-gotten gains. Defendants continue to engage in the unlawful, unfair, and unconscionable conduct that is the subject of this Complaint.

94.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained counsel competent and experienced in both consumer protection and class action litigation.  Plaintiff and his counsel do not foresee any circumstances where the interests of Plaintiff would be adverse to the interests of the Class.

95.    Certification of this class action is appropriate under Fed. R. Civ. P. 23, because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes a class action superior to other available methods for the fair and efficient adjudication of this controversy.  It would be economically impractical for Plaintiff and Class members to pursue individual actions against Defendants as the costs of prosecution would likely surpass their individual damages.   Thus, Plaintiff and Class members would be left with no effective remedy for the damages they suffered and continue to suffer.  Class treatment of

40

CLASS ACTION COMPLAINT

Plaintiff's claims will permit Plaintiff and the Class to vindicate their rights against Defendants and conserve the resources of the Court and the Parties.   Class treatment will also avoid the possibility of inconsistent outcomes that could result from a multitude of individual actions in varying jurisdictions nationwide.

96.   Certification also is appropriate because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate the relief sought on behalf of the Class as a whole.  Further, given the large number of consumers of Monster Energy Drinks, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

97.   A class action is a manageable, fair and appropriate method for the group-wide adjudication of this controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the Courts that individual actions would engender.

98.   Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude maintenance as a class action. Moreover, the benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

## COUNT I

### For Violations of the UCL, Cal. Bus. & Prof. Code Section 17200, *et seq.*

99.   Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

41

CLASS ACTION COMPLAINT

100.   This cause of action is brought pursuant to California Business & Professions Code §17200, *et seq.*, which provides that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter I (commencing with Section 17500) of the Business and Professions Code."

101.   Defendants' practices, representations and omissions, as set forth above, were intended to promote the sale of Monster Energy Drinks and constitute unfair, deceptive and/or unlawful business practices within the meaning of California Business & Professions Code §17200, *et seq.*

102.   Defendants committed unfair business acts and/or practices.

103.   Nothing in Monster's packaging, labeling, advertising, marketing, promotion or sale of Monster Energy Drinks disclosed, or adequately disclosed, the amount of caffeine in Monster Energy Drinks or the risks associated with caffeine as used in Monster Energy Drinks, as set forth in detail above.

104.   Statements on Defendants' Monster Energy Drinks labels lack proper warnings, and are thus considered false, misleading and/or deceptive representations, practices or omissions.  Defendants have consistently failed to disclose or warn consumers that Monster Energy Drinks may increase blood pressure and/or heart rate of consumers who ingest Monster Energy Drinks or that such drinks may cause nervousness, irritability, and/or sleeplessness, and that this failure to disclose or warn deceives or tends to deceive consumers.

105.   Consequently, consumers who purchase Defendants' Monster Energy Drinks may experience an increase in blood pressure and/or an increase in their heart rate without having knowledge of such adverse reactions associated with drinking Monster Energy Drinks.

CLASS ACTION COMPLAINT

106.   Plaintiff relied on the truth and accuracy of the labeling on Monster Energy Drinks, but based on the label's failure to disclose, or adequately disclose, the amount of caffeine in the Energy Drinks or the risks associated with caffeine as used in Monster Energy Drinks, material facts that would have been substantial factors in his decision to purchase and consume Monster Energy Drinks for the reasons set forth above, Plaintiff was deceived by Defendants into purchasing and paying for the Monster Energy Drinks as set forth above.

107.   The utility of Defendants' practices, representations and omissions related to the packaging, labeling, advertising, marketing, promotion and sale of Monster Energy Drinks without disclosing, or adequately disclosing, that the amount of caffeine in Monster Energy Drinks or the risks associated with caffeine as used in Monster Energy Drinks, is negligible, if there is any utility at all, when weighed against the harm to the general public, Plaintiff and members of the Class.

108.   The harmful impact upon members of the general public and the Class – particularly the teenagers and youth the Company targets in its advertising, marketing and promotion campaign – who purchased and used Monster Energy Drinks outweighs any reasons or justifications by Defendants for the unfair business practices they employed to sell Monster Energy Drinks described herein, particularly considering the reasonably available alternatives.

109.   Defendants had an improper motive (profit before accurate marketing) at their intended audience in their practices, representations and omissions related to the packaging, labeling, advertising, marketing, promotion and sale of Monster Energy Drinks, specifically by implementing promotions and other marketing strategies designed to attract adolescents and youth, as set forth above.

110.   The use of such unfair business acts and practices was and is under the sole control of Defendants, and was deceptively hidden from members of the

43

Class and the general public in their packaging, labeling, advertising, marketing, promotion and sale of Monster Energy Drinks.

111.  Defendants engaged in deceptive acts or practices by failing to disclose, or adequately disclose, to the consumers targeted by Defendants' advertising and promotional campaign, the amount of caffeine in Monster Energy Drinks or the risks associated with caffeine as used in Monster Energy Drinks, as set forth in detail above.

112.  Defendants also engaged in deceptive acts or practices in labeling and describing Monster Energy Drinks in a manner as to appeal to pre-teens and teens, and by comparing favorably the "buzz" one gets from drinking Monster Energy Drinks to that obtained by drinking alcohol.

113.  Defendants engaged in deceptive acts or practices by promoting the stocking of Monster Energy Drinks near sports drinks.

114.  These deceptive acts and practices had a capacity, tendency, and/or likelihood to deceive or confuse reasonable consumers into believing that Monster Energy Drinks posed no greater risk to the health of those who drank it than did other sports drinks, particularly given the existence of peer-reviewed scientific studies indicating the dangers of caffeinated energy beverages.

115.  Defendants also engaged in unlawful business practices by violating California's False Advertising Law ("FAL"), the CLRA, the MMWA as well as state warranty laws, as set forth in detail below.  The violations of these laws serve as predicate violations of this prong of the UCL.

116.  As a purchaser and consumer of Monster Energy Drinks, and as a member of the general public who purchased and used Monster Energy Drinks, Plaintiff has standing and is entitled to and does bring this class action seeking all available remedies under the UCL.

CLASS ACTION COMPLAINT

117.   Pursuant to California Business & Professions Code §17203, Plaintiff seeks an order of this Court for injunctive relief and disgorging from Defendants and restoring to Plaintiff and members of the Class all monies that may have been acquired by Defendants as a result of such unfair, deceptive and/or unlawful business acts or practices.

118.   Plaintiff, members of the Class and the general public may be irreparably harmed and/or denied an effective and complete remedy if such relief is not granted.

119.   As a result of Defendants violations of the UCL, Plaintiff and members of the Class are entitled to restitution for out-of-pocket expenses and economic harm in terms of the price they paid for Monster Energy Drinks.

120.   Pursuant to California Civil Code §3287(a), Plaintiff and members of the Class are further entitled to pre-judgment interest as a direct and proximate result of Defendants' wrongful conduct.  The amount on which interest is to be applied is a sum certain and capable of calculation, and Plaintiff and members of the Class are entitled to interest in an amount according to proof.

## COUNT II

### For Violations of the FAL, Bus. & Prof. Code Section 17500, *et seq*.

121.   Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

122.   In violation of California Business & Professions Code Section 17500, Defendants have disseminated, or caused to be disseminated advertising, labeling, packaging, marketing, and promotion of Monster Energy Drinks that is deceptive because of its failure to warn of the particular dangers inherent in consuming a highly caffeinated beverage by adolescents and youth.

45

CLASS ACTION COMPLAINT

123. Defendants compounded this deception by likening the effect of drinking Monster Energy Drinks to consuming alcohol in the advertising, packaging and labeling of Monster Energy Drinks, and by promoting the stocking of Monster Energy Drinks near sports drinks.

124. These acts deceptively represented Monster Energy Drinks as posing no greater risk to the health of those who drank it than did sports drinks.

125. Defendants' representations and omissions for Monster Energy Drinks are by their very nature unfair, deceptive and/or unlawful within the meaning of California Business & Professions Code Section §17500, *et seq.*, and were likely to deceive reasonable consumers.

126. In making and disseminating the representation and omissions alleged herein, Defendants knew or should have known they were misleading, particularly given the existence of peer-reviewed scientific studies indicating the dangers of caffeinated energy drinks. Accordingly, Defendants acted in violation of California Business & Professions Code Section §17500, *et seq.*

127. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class members have suffered substantial harm.

128. Pursuant to California Business & Professions Code Section §17535, Plaintiff, on behalf of himself and others similarly situated, seeks an order of this Court restoring all monies that may have been acquired by Defendants as a result of such deceptive acts and/or practices.

129. As a result of Defendants' violations of the FAL, Plaintiff and the Class are entitled to restitution for out-of-pocket expenses and economic harm.

130. Pursuant to California Civil Code Section 3287(a), Plaintiff and members of the Class are further entitled to pre-judgment interest as a direct and proximate result of Defendants' wrongful conduct. The amount on which interest

CLASS ACTION COMPLAINT

is to be applied is a sum certain and capable of calculation, and Plaintiff and members of the Class are entitled to interest in an amount according to proof.

## COUNT III

### For Violations of the CLRA, Cal. Civ. Code Section 1750, *et seq.*

131.   Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

132.   This cause of action is brought pursuant to the CLRA.

133.   Plaintiff and each member of the Class are "consumers" within the meaning of California Civil Code §1761(d).

134.   The purchases of Monster Energy Drinks by Plaintiff and each member of the Class were and are "transactions" within the meaning of California Civil Code §1761(e).

135.   Defendants have violated the CLRA by, among other things, their representations, practices and omissions in the labeling, advertising, marketing, promotion and sales of Monster Energy Drinks that Monster Energy Drinks were safe for consumption when they knew or had access to information that indicated that Defendants' representations were false and misleading.

136.   Defendants' labeling, advertising, marketing, promotion and sales of Monster Energy Drinks as alleged herein, violated Section 1770(a) of the CLRA in at least the following respects for the reasons set forth in detail above:

(a) Misrepresenting the source, sponsorship, approval, or certification of goods or services (Cal. Civ. Code §1770(a)(2));

(b) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have (Cal. Civ. Code §1770(a)(5));

47

(c) Representing that goods or services are of a particular standard, quality, grade, or that goods are of a particular style or model, if they are of another (Cal. Civ. Code §1770(a)(7));

(d) Advertising goods or services with intent not to sell them as advertised (Cal. Civ. Code §1770(a)(9));

(e) Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law (Cal. Civ. Code §1770(a)(14)); and

(f) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal. Civ. Code §1770(a)(16)).

137.   As a result of the use or employment by Defendants of methods, acts or practices declared unlawful by the above provisions of Cal. Civ. Code §1770, Plaintiff suffered damage in that he bought the Monster Energy Drinks and thus paid monies that he would not have expended had the true facts been accurately disclosed to him and had Monster Energy Drinks not been promoted as they were in light of the material adverse facts set forth above, or spent more money on Monster Energy Drinks than he otherwise would have.  Plaintiff therefore seeks and is entitled to, on behalf of both himself and members of the Class, equitable relief in the form of an order for injunctive relief and requiring Monster to make full restitution of all monies wrongfully obtained as a result of the conduct described above.

138.   Pursuant to California Civil Code §1780(d), Plaintiff requests that this Court enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein.  If Defendants are not restrained from engaging in these types of practices in the future, Plaintiff and other members of the Class will continue to suffer harm.

CLASS ACTION COMPLAINT

139.   This cause of action does not, at this point, seek monetary damages but is confined solely to injunctive relief.  Plaintiff will seek to amend this class action Complaint to seek damages in accordance with the CLRA after providing Defendants with notice pursuant to California Civil Code §1782.

140.   Regardless of an award of damages, Plaintiff also separately seeks and is entitled to, pursuant to section 1780(d) of the CLRA, an order for the equitable relief described above, as well as costs, attorneys' fees and any other relief which the Court deems proper.

## COUNT IV

### Breach of Express and Implied Warranty

141.   Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

142.   Plaintiff and the Class purchased Monster Energy Drinks.  By virtue of their purchases and the payment of monies, they formed a contract that included promises and affirmations made by Defendants through the labeling, packaging and accompanying advertising and marketing of the Monster Energy Drinks.

143.   The labeling and packaging of Monster Energy Drinks constitutes express warranties that Monster Energy Drinks are the "ideal combo of the right ingredients in the right proportion," and "bigger is better . . . because you can never get too much of a good thing."  These warranties became part of the bargain between Plaintiff and the Class on the one hand and Defendants on the other.

144.   Plaintiff and the members of the Class relied upon Defendants' statements and Defendants' research and investigation regarding the safety of the Monster Energy Drinks in purchasing and consuming them.

145.   Defendants intended to and did in fact, and continue to the present, target their marketing to teenagers and adolescents by handing out free samples of

49

CLASS ACTION COMPLAINT

Monster Energy Drinks outside high schools, sports and music events without regard to the age of the recipient.

146.   Monster Energy Drinks were not fit for the purposes for which they were intended, particularly not to the audience that Defendants was targeting with their Monster Energy Drinks.   The Monster Energy Drinks Plaintiff consumed were neither safe for their intended use, nor of merchantable quality, in that they do not contain "the right ingredients in the right proportions" for adolescents and youth.   Defendants, thus, breached their express warranties with Plaintiff and the Class, and they have been injured as a result.

147.   Whether or not expressly made, such warranties that the Monster Energy Drinks are fit for the purposes intended and are safe is implied by law in all consumer transactions.

148.   Unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.   *See* U.C.C. §2-314; Cal. Com. Code §2314.

149.   Monster Energy Drinks are "goods," as defined in the Uniform and California Commercial Code.   U.C.C. §2-105(1).

150.   Plaintiff and members of the Class are each a "Consumer" meaning an individual who buys or contracts to buy goods that, at the time of contracting, are intended by the individual to be used primarily for personal, family, or household purposes.   U.C.C. §2-314.

151.   As designers, manufacturers, licensors, producers, marketers, and sellers of the Monster Energy Drinks, the Company is a "merchant" within the meaning of the U.C.C. and California Commercial Code.   U.C.C. §2-104(1); Cal. Com. Code §2104(1).

152.   By placing the Monster Energy Drinks in the stream of commerce, Defendants impliedly warranted that the Monster Energy Drinks are reasonably

50

safe, effective and adequately tested for its intended use, i.e., are fit for the ordinary purposes for which goods of that description are used and are adequately contained, packaged, and labeled.

153. Defendants marketed and sold Monster Energy Drinks using misleading marketing materials emphasizing the positive aspects of the Energy Drinks while neglecting to inform the consumer of the risks associated with its consumption, including increase heart rate, high blood pressure, arrhythmia, dehydration, sleep deprivation and diarrhea.

154. As merchants of the Monster Energy Drinks, Defendants knew that purchasers relied upon them to design, manufacture, license and sell products that were reasonably safe and effective.  Defendants impliedly warranted to Plaintiff and members of the Class that Monster Energy Drinks were of merchantable quality and safe and fit for the use for which they was intended.  Plaintiff and the Class reasonably relied entirely on Defendants' expertise, knowledge, skill, judgment, and implied warranty in choosing to purchase and consume Monster Energy Drinks.

155. Plaintiff and the Class members purchased the Monster Energy Drinks for its intended purpose i.e. for consumption.

156. In breach of Defendants' implied warranties, the Monster Energy Drinks are unsafe, ineffective and not merchantable for ways which include, but are not limited to the fact, that it can cause serious and even fatal health problems, that the caffeine content in the Monster Energy Drinks is dangerously high for consumption by adolescents and children, that frequent and excessive consumption may result in increasing heart rate, blood pressure, other cardiovascular complications, sleep deprivation and diarrhea, among others.

157. Monster Energy Drinks are not reasonably safe for their intended use and the labels do not adequately warn of such dangers or even disclose the caffeine

CLASS ACTION COMPLAINT

content, especially for teenager and youth targeted by the Company's advertising, marketing and promotion campaign.

158.   Plaintiff and the Class, who could not have known about the nature of the risks and side effects associated with Monster Energy Drinks until after they purchased or used it.   Moreover, the risks associated with consuming Monster Energy Drinks far outweigh any perceived benefits.

159.   By selling, delivering and/or distributing the defective Monster Energy Drinks to Plaintiff and the Class, Defendants breached the implied warranty of merchantability and the implied warranty of fitness.

160.   As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and Class members have sustained injuries by purchasing the Monster Energy Drinks which were not safe or effective as represented, thus entitling Plaintiff to judgment and equitable relief against Defendants, as well as restitution, including all monies paid for the Monster Energy Drinks.

## COUNT V

### For Violations of the MMWA, 15 U.S.C. Section 2301, *et seq.*

161.   Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

162.   Plaintiff and Class members are "consumers" within the meaning of the MMWA.

163.   The Company is a "supplier" and "warrantor" within the meaning of the MMWA.

164.   Monster Energy Drinks are "consumer products" within the meaning of the MMWA.

165.   Defendants' written affirmations of fact, promises and/or descriptions, as alleged herein, are each a "written warranty" and/or there exists an implied

52

CLASS ACTION COMPLAINT

warranty for the sale of Monster Energy Drinks within the meaning of the MMWA, i.e., that they are safe for consumption.

166.   The Company breached its warranties as Monster Energy Drinks were not fit for their intended use. Defendants' conduct thereby caused damages to Plaintiff and members of the Class.

167.   The amount in controversy meets or exceeds the sum or value of $5 million (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

168.   As a result of the Company's breach of warranties, Plaintiff and Class members have sustained damages and other losses in an amount to be determined at trial, as well as attorneys' fees, rescission, and/or other relief as is deemed appropriate.

## COUNT VI

### Unjust Enrichment

169.   Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

170.   At all times relevant hereto, Defendants designed, manufactured, licensed, produced, promoted, marketed and/or sold the ineffective, dangerous and improperly labeled Monster Energy Drinks.

171.   Plaintiff and members of the Class conferred a benefit upon Defendants by paying for a product with benefits that could not be provided or delivered and were not safe and effective as advertised.  By means of their material misrepresentations and omissions, as set forth above, Defendants induced Plaintiff and the Class to purchase Monster Energy Drinks provided no substantial benefit to consumers, but actually may have caused significant detriment to their health and mental well-being.  As a consequence of such misrepresentations and

CLASS ACTION COMPLAINT

53

misconduct, Plaintiff and the members of the Class paid monies to obtain the Monster Energy Drinks.

172.   Defendants voluntarily accepted and retained the benefit of the monies paid by Plaintiff and the Class with full knowledge of the dangers of the Monster Energy Drinks and without adequately disclosing those risks.

173.   Defendants have been enriched, at the expense of Plaintiff and the Class, by retaining monies for benefits, which they did not provide.

174.   Plaintiff and the Class have no adequate remedy at law.

175.   It would be unjust and inequitable for Defendants to retain the profits, benefits, and other compensation obtained from its wrongful conduct as alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, on behalf of himself and all others similarly situated, prays for judgment against Defendants as follows:

A.   Certifying the Class as requested for all claims asserted herein;

B.   Awarding Plaintiff and the proposed Class members actual, statutory and punitive damages;

C.   Awarding declaratory and injunctive relief as permitted by law or equity, including corrective labeling, advertising and marketing;

D.   Ordering that Defendants be required to make full restitution of all monies wrongfully obtained as a result of the conduct described above and disgorge all ill-gotten gains flowing from the conduct described above;

E.   Ordering that Defendants be required to pay pre- and post-judgment interest on all such sums;

F.   Providing such further relief as may be just and proper;

G.   Other legal and equitable relief permitted with respect to the causes of action stated herein;

54

CLASS ACTION COMPLAINT

H.    A trial by jury on all issues so triable; and;

I.    Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury with respect to any claims so triable.

DATED:  December 18, 2012

THE MEHDI FIRM

AZRA Z. MEHDI

9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210
Telephone:  (310) 853-8010
Facsimile:  (310) 853-8011

One Market
Spear Tower, Suite 3600
San Francisco, CA  94105
Telephone:  (415) 293-8039
Facsimile:  (415) 293-8001
azram@themehdifirm.com

HALUNEN & ASSOCIATES
CLAYTON D. HALUNEN
SUSAN M. COLER
MELISSA W. WOLCHANSKY
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone:  (612) 605-4098
Facsimile:  (612) 605-4099
halunen@halunenlaw.com
coler@halunenlaw.com
wolchansky@halunenlaw.com

Attorneys for Plaintiff and the [Proposed]
Class

CLASS ACTION COMPLAINT

EXHIBIT A

U.S. Department of Health and Human Services
Food and Drug Administration
Center for Food Safety and Applied Nutrition

CFSAN Adverse Event Reporting System
Voluntary and Mandatory Reports on 5-Hour Energy, Monster Energy, and Rockstar
Energy Drink
January 1, 2004, through October 23, 2012

## Introduction

FDA's Center for Food Safety and Applied Nutrition (CFSAN) Adverse Event Reporting
System (CAERS) collects reports about adverse health events and product complaints
related to CFSAN-regulated products, including conventional foods, dietary supplements,
and cosmetics. Based on a search of CAERS, this document summarizes the adverse
events reported to FDA in connection with products under the labels 5-Hour Energy,
Monster, and Rockstar between January 1, 2004 and October 23, 2012. These products
are currently marketed as dietary supplements.

CAERS includes voluntary reports for cosmetics and conventional foods, and both
voluntary and mandatory reports for dietary supplements. Mandatory reports are those
required by the Dietary Supplement and Nonprescription Drug Consumer Protection Act.
Specifically, dietary supplement manufacturers, packers, and distributors must notify
FDA if they receive reports about serious adverse events in connection with the use of
their products. This law defines a serious adverse event as an adverse health-related event
that is associated with the use of a dietary supplement and that results in death, a life-
threatening experience, inpatient hospitalization, a persistent or significant disability or
incapacity, a congenital anomaly or birth defect, or that requires, based on reasonable
medical judgment, a medical or surgical intervention to prevent one of those outcomes.
The requirement to report serious adverse events to FDA applies only to dietary
supplements and not to beverages, other conventional foods, or cosmetics.

Medical officers with the agency's Dietary Supplement Program staff review all serious
adverse events reported to FDA about dietary supplements as part of the normal process
of assessment and categorization. In addition to these mandatory reports, the CAERS
system also contains adverse events (both serious and non-serious) that are voluntarily
reported to FDA by consumers and health care providers.

FDA encourages consumers and health care providers to report adverse events they
believe may be related to FDA-regulated products to FDA's MedWatch Adverse Event
Reporting Program (http://www.fda.gov/Safety/MedWatch/default.htm). FDA advises
consumers to talk with their health care providers before using any product marketed as
an "energy shot" or "energy drink."

Exhibit A

**<u>Things You Should Know About Adverse Event Report Data</u>**

Individual adverse event reports about a particular product and the total number of adverse event reports for that product in CAERS only reflect information **AS REPORTED** and do not represent any conclusion by FDA about whether the product actually caused the adverse events. Because CAERS is constantly updated with new information, the number of reports for a given product and the content of individual reports may change over time.

Even with mandatory reporting of serious adverse events for dietary supplements, generally only a small fraction of adverse events associated with any product is reported. On the other hand, there may be duplicate reports in CAERS for the same adverse event because multiple people (such as an injured consumer and a health care provider who treated him or her) may have submitted reports.

There are important limitations to making inferences based on data from adverse event reports, such as those in CAERS.

- Reports to FDA do not necessarily include all relevant data, such as whether an individual also suffered from other medical conditions (such as cardiac disease) or took other supplements or medication at the same time.

- Reports may not include accurate or complete contact information for FDA to seek further information about the event, or complainants may choose not to participate in the follow-up investigation.

When important information is missing from a report, it is difficult for FDA to fully evaluate whether the product caused the adverse event or simply coincided with it. The fact that an adverse event happened after a person took a dietary supplement does not necessarily mean that the dietary supplement caused the adverse event.

Exhibit A

57

## CAERS Adverse Events Reports Allegedly Related to Monster
### Search Terms: Monster

The Center for Food Safety Adverse Event Reporting System (CAERS) is a post-market surveillance system that collects reports about events or problems that are allegedly related to CFSAN regulated products. In some reports, information in the reports cannot be verified for accuracy. Furthermore, in many reports, individuals may have used other products, and many products contain multiple ingredients which further complicates the evaluation of adverse event reports.

There is no certainty that a reported adverse event can be attributed to a particular product or ingredient. The number of adverse event reports in CAERS received by FDA and the adverse event report itself about a particular product only reflects information **AS REPORTED** and does not represent any conclusion by FDA regarding a causal relationship or association with the product or ingredient. Due to the continuous inclusion of new or updated information into the CAERS system, reports released from CAERS containing adverse event data may change over time.

Each report received by CAERS regarding an individual that experiences an adverse event is assigned a unique report number (Report #).

*Previous versions of this document may include CAERS reports 150942 and 150496. Since we received two CAERS reports for the same individual, we have merged them into a single CAERS report (150942).

^ Additional dates indicate receipt of additional materials on report.

| Report # | Received Date | Brand/Product Name | Symptoms | Outcomes |
|---|---|---|---|---|
| 66354 | 2/4/04 | MONSTER ENERGY ENERGY SUPPLEMENT DRINK | ABDOMINAL PAIN UPPER, RETCHING, VOMITING, DIARRHOEA, WEIGHT DECREASED, DIZZINESS, HOSPITALISATION | LIFE THREATENING, HOSPITALIZATION |
| 71234 | 8/11/04 | MONSTER ENERGY DRINK | MYOCARDIAL INFARCTION, ELECTROCARDIOGRAM ST SEGMENT ELEVATION, HOSPITALISATION | HOSPITALIZATION, LIFE THREATENING |
| 75388 | 1/10/05 | MONSTER BEVERAGE CO MONSTER ENERGY | FATIGUE | VISITED A HEALTH CARE PROVIDER |
| 78111 | 4/6/05 | HANSENS MONSTER ENERGY DRINK | PHARYNGITIS, DIZZINESS | NON-SERIOUS INJURIES/ ILLNESS |
| 86237 | 3/22/06 | MONSTER ENERGY DRINK | TREMOR, DYSPNOEA, VOMITING, CHEST PAIN, TREMOR, RHABDOMYOLYSIS, MYOCLONUS | HOSPITALIZATION, VISITED AN ER, LIFE THREATENING |
| 111857 | 4/7/09 | MONSTER ENERGY DRINK | DEATH | DEATH |
| 112784 | 4/7/09 | MONSTER BLUE LOW CARB ENERGY DRINK | NAUSEA, THROAT IRRITATION | NON-SERIOUS INJURIES/ ILLNESS |

Exhibit A

58

| Report # | Received Date | Brand/Product Name | Symptoms | Outcomes |
|---|---|---|---|---|
| 113068 | 5/7/09 | MONSTER ENERGY DRINK | BIPOLAR DISORDER, PSYCHOTIC DISORDER, PERSONALITY DISORDER, SUICIDAL IDEATION | HOSPITALIZATION |
| 116885 | 6/2/09 | JAVA MONSTER PLUS ENERGY ENERGY DRINK RUSSIAN FLAVOR | GASTROENTERITIS SALMONELLA, MALAISE, VOMITING, BACK PAIN, HEADACHE, ABDOMINAL PAIN, COUGH, DIARRHOEA | NON-SERIOUS INJURIES/ ILLNESS |
| 128536 | 7/28/10 | MONSTER ENERGY DRINK | FATIGUE, INFLUENZA LIKE ILLNESS, MEMORY IMPAIRMENT, MIGRAINE, ANGINA PECTORIS, PALPITATIONS, EYE PAIN, MALAISE, DYSURIA, NEUROPATHY PERIPHERAL, NIGHT SWEATS, DECREASED APPETITE, ASTHENIA, PAIN, INSOMNIA, HEADACHE, FLUSHING, VISUAL ACUITY REDUCED | LIFE THREATENING, HOSPITALIZATION |
| 130690 | 10/5/10 | MONSTER ENERGY DRINK | DYSPNOEA, POLLAKIURIA, BLOOD POTASSIUM DECREASED | VISITED AN ER, HOSPITALIZATION |
| 132041^ | 11/12/10  6/21/12 | MONSTER NITROUS | DEATH | DEATH |
| 133771 | 12/8/10 | JAVA MONSTER MEAN BEAN COFFEE FLAVORED ENERGY DRINK | VOMITING, ABDOMINAL PAIN | NON-SERIOUS INJURIES/ ILLNESS |
| 142050 | 8/1/11 | MONSTER ENERGY | LETHARGY, ABDOMINAL PAIN, HEART RATE ABNORMAL | NON-SERIOUS INJURIES/ ILLNESS |
| 143117 | 8/1/11 | MONSTER/LOW CARB ENERGY DRINK | CONJUNCTIVITIS | VISITED A HEALTH CARE PROVIDER, NON-SERIOUS INJURIES/ ILLNESS |
| 144780 | 4/14/11 | MONSTER HIT MAN ENERGY DRINK | NAUSEA, DIZZINESS, VOMITING, HEART RATE ABNORMAL, BLOOD PRESSURE FLUCTUATION | NON-SERIOUS INJURIES/ ILLNESS |

Exhibit A

59

| Report # | Received Date | Brand/Product Name | Symptoms | Outcomes |
|---|---|---|---|---|
| 145133 | 10/26/11 | MONSTER DRINK | MUSCLE SPASMS, ABASIA, DIZZINESS, MUSCULOSKELETAL STIFFNESS, DYSPNOEA, PAIN IN EXTREMITY | OTHER SERIOUS (IMPORTANT MEDICAL EVENTS) |
| 145546 | 11/10/11 | MONSTER ENERGY DRINK | HEART RATE ABNORMAL, SKIN DISCOLOURATION, BLOOD PRESSURE INCREASED | VISITED AN ER |
| 146476^ | 12/7/11 3/27/12 4/4/12 | MONSTER DRINKS | LOSS OF CONSCIOUSNESS | DEATH |
| 146479 | 12/6/11 | MONSTER ENERGY DRINK | HEART RATE IRREGULAR, DYSPNOEA, ATRIAL FIBRILLATION | HOSPITALIZATION |
| 147297 | 12/30/11 | MONSTER | DEATH | DEATH |
| 147873 | 12/5/11 | MONSTER ENERGY DRINK | ABDOMINAL PAIN | NON-SERIOUS INJURIES/ ILLNESS |
| 150719 | 4/3/12 | MONSTER ENERGY DRINK | FATIGUE, IRRITABILITY, DEPENDENCE | NON-SERIOUS INJURIES/ ILLNESS |
| 150941 | 4/6/12 | MONSTER | TREMOR, RESPIRATORY RATE INCREASED | VISITED A HEALTH CARE PROVIDER, HOSPITALIZATION |
| *150942^ | 3/27/12 4/9/12 | MONSTER ENERGY DRINK | CARDIAC ARREST, ARRHYTHMIA, DRUG TOXICITY | DEATH |
| 151016 | 4/9/12 | MONSTER ENERGY DRINKS | DYSPNOEA, CHEST PAIN | VISITED AN ER, OTHER SERIOUS (IMPORTANT MEDICAL EVENTS) |
| 151782 | 4/27/12 | MONSTER ENERGY REHAB PROTEAN + ENERGY 15.5 OZ | THROAT TIGHTNESS, HYPERSENSITIVITY | HOSPITALIZATION |
| 152471 | 5/15/12 | MONSTER ENERGY | DIARRHOEA, VOMITING, CHROMATURIA, JAUNDICE, PRURITUS, ANOREXIA, BILIARY SPHINCTEROTOMY, CHOLESTASIS, GALLBLADDER DISORDER, PANCREATIC DISORDER | OTHER SERIOUS (IMPORTANT MEDICAL EVENTS), HOSPITALIZATION |

Exhibit A

60

| Report # | Received Date | Brand/Product Name | Symptoms | Outcomes |
|---|---|---|---|---|
| 153012 | 5/31/12 | MONSTER ENERGY REHAB PROTEAN | RESPIRATORY ARREST, CARDIAC ARREST | HOSPITALIZATION |
| 153279 | 6/11/12 | MONSTER ENERGY 16 OZ | DIZZINESS, TREMOR, ANXIETY | HOSPITALIZATION |
| 153974 | 6/29/12 | MONSTER ENERGY IMPORT DUB EDITION | OROPHARYNGEAL SWELLING | VISITED AN ER, HOSPITALIZATION |
| 154641 | 7/20/12 | MONSTER ENERGY IMPORT | CONFUSIONAL STATE, CHEST PAIN, PAIN, HEADACHE, CHILLS, DIZZINESS | VISITED AN ER, HOSPITALIZATION |
| 155221 | 8/7/12 | MONSTER ENERGY 16 OZ | DYSPNOEA, FEELING JITTERY, HYPOAESTHESIA | HOSPITALIZATION |
| 155267 | 8/8/12 | MONSTER ENERGY | HYPERSENSITIVITY, EMOTIONAL DISTRESS, URTICARIA | VISITED AN ER, HOSPITALIZATION |
| 155411 | 8/10/12 | MONSTER ENERGY DRINK | HYPERSENSITIVITY, MALAISE | CONGENITAL ANOMALY, REQ. INTERVENTION TO PRVNT PERM. IMPRMNT., LIFE THREATENING, DISABILITY |
| 155735 | 8/22/12 | MONSTER ENERGY | HEART RATE INCREASED, PALPITATIONS, FALL | HOSPITALIZATION |
| 155835 | 8/27/12 | MONSTER ENERGY ANTI- GRAVITY 12 FL. OZ | ORAL HERPES, HYPERSENSITIVITY, RASH, PRURITUS | HOSPITALIZATION |
| 156002 | 8/30/12 | MONSTER ENERGY ABSOLUTELY ZERO | ABDOMINAL PAIN UPPER, VOMITING, SYNCOPE, DIARRHOEA, DEHYDRATION | HOSPITALIZATION |
| 156830 | 9/20/12 | MONSTER ENERGY | CHOKING, HAEMORRHAGE, FOREIGN BODY TRAUMA, RETCHING | VISITED AN ER, HOSPITALIZATION |
| 157791 | 10/11/12 | MONSTER ENERGY REHAB GREEN TEA 15.5OZ | SYNCOPE, MYOCARDIAL INFARCTION, FOOD POISONING, DIZZINESS, FEELING ABNORMAL | VISITED A HEALTH CARE PROVIDER |
| 40 | | | | |

Exhibit A

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| CONNOR ROCKS | HANSEN BEVERAGE CORPORATION<br>MONSTER ENERGY COMPANY |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Azra Z. Mehdi<br>THE MEHDI FIRM<br>9107 Wilshire Blvd., Suite 450, Beverly Hills, CA 90210 (310) 853-8010 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☑ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:  JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No  ☑ **MONEY DEMANDED IN COMPLAINT:** $ in excess of $5 million

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §1332, Class Action Fairness Act of 2005, Magnuson-Moss Warranty Act (alleged breach of warranties), 28 U.S.C. §2301, et seq.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accommodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☑ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**  Case Number: **EDCV12 - 02231 VAP (SPx)**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No   ☐ Yes
If yes, list case number(s):

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No   ☑ Yes
If yes, list case number(s): EDCV 12-02188 VAP (OPx)

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☑ A. Arise from the same or closely related transactions, happenings, or events; or
☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☑ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Florida |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Riverside | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
    Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Riverside | All 50 states. |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _Azra Mehdi_   Date December 18, 2012

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Virginia A. Phillips and the assigned discovery Magistrate Judge is Sheri Pym.

The case number on all documents filed with the Court should read as follows:

### EDCV12- 2231 VAP (SPx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | | **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | | **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Name & Address: AZRA Z. MEHDI (220406)
THE MEHDI FIRM
9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONNOR RUCKS, Individually and on Behalf of All Others Similarly Situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>MONSTER BEVERAGE CORPORATION, MONSTER ENERGY COMPANY, and DOES 1-20, inclusive,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**EDCV12 - 02231 VAP (SPx)**<br><br><br>**SUMMONS** |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Azra Z. Mehdi_____, whose address is _9107 Wilshire Blvd., Suite 450, Beverly Hills, CA 90210_____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _December 18, 2012_

By:     **DENISE VO**

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                                    SUMMONS